National Yarn Corporation v. Commissioner.
National Yarn Corp. v. Commissioner
Docket No. 19451.
United States Tax Court
1950 Tax Ct. Memo LEXIS 145; 9 T.C.M. (CCH) 603; T.C.M. (RIA) 50178; July 19, 1950
*145 Petitioner, a corporation engaged in the business of processing and selling wool yarn, has grown continually since its incorporation in 1923. In 1934, petitioner, having outgrown its Chicago quarters, moved to Cleveland and by 1941, petitioner again needed a new and larger building, upon which petitioner took action as soon as wartime restrictions were lifted. In normal times, prior to 1941, petitioner was without adequate working capital. Petitioner accumulated its earnings for the taxable year 1944, along with earnings of prior years, to provide necessary working capital, and for expansion. The Commissioner has determined that petitioner accumulated its earnings and profits beyond the reasonable needs of its business, and was availed of in the taxable year 1944 for the purpose of preventing the imposition of surtax upon its stockholders. Held, the amount which petitioner added to its earned surplus in the taxable year 1944 was not unreasonable in amount in view of the needs of the business, and petitioner was not availed of in the taxable year for the purpose of preventing the imposition of surtax upon its stockholders. Harold H. Kahn, Esq., National City Bank Bldg; Cleveland, Ohio, and Arthur J Stern, Esq., for the petitioner. William R. Bagby, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion In the deficiency notice the Commissioner has added to the $179,839.73 net income as disclosed by petitioner's return for 1944, six items designated as (a), (b), (c), (d), (e) and (f) which aggregate $9,684.39, and he has allowed an additional deduction designated as "(g) Amortization $511.79." With reference to the foregoing adjustments, the deficiency notice states: These adjustments were accepted by you as evidenced by an agreement, Form 874, signed by your representative on your behalf on February 6, 1948. The deficiency of excess profits tax of $8,863.85 shown thereon has been assessed and the overassessment of income tax of $477.78 has been scheduled. Petitioner's excess profits tax for the year 1944 of $117,068.61, which includes the foregoing additional assessment of $8,863.85 in excess profits tax, is not in issue in this proceeding. However, respondent has determined a deficiency in petitioner's income tax of $8,594.84 based on an application of section 102 of the Internal Revenue Code. To this action of the Commissioner, petitioner assigns error as follows: The Commissioner erred in finding that $31,253.98 of petitioner's income for the year 1944 was an accumulation of earnings beyond the reasonable needs of petitioner's business, and imposing a surtax thereon in the sum set forth in paragraph 4, hereinabove. Findings of Fact Petitioner is a Delaware corporation engaged *146 in the business of processing and selling wool yarn. Its principal place of business during the taxable year was in Cleveland, Ohio, and its returns were filed with the Collector for the 18th District of Ohio. Petitioner purchases wool yarn from the spinning mills in an undyed state and in skein form, a small portion of which is resold in the identical form purchased. The greater percentage of the yarn is dyed (by persons other than petitioner), and is then processed by petitioner on winding and conditioning machinery and resold in cone form, ready for knitting. Petitioner was founded in 1923, by Boris Mishell and the brothers Leff, Philip and Carl, who were not related in any way to Boris Mishell. These three men paid the sum of $50,000 for the capital stock of petitioner which was held by them in equal proportions. Boris Mishell had no money and borrowed his share of the investment. From its incorporation in 1923, to 1934, petitioner's offices, warehouse and plant were located in Chicago, Illinois, occupying approximately 7,500 square feet of floor space on two floors. The first floor contained general offices, warehouse and shipping room, and the winding and conditioning machinery *147 was located in the basement. During the first few years of petitioner's existence its annual gross sales were approximately $250,000 and by 1928, petitioner was able to show a surplus of approximately $2,000. During the next five years the business of petitioner gradually expanded until by 1933, its annual gross sales volume was approximately $1,000,000. Because of this increase in sales and the location of its customers, the space occupied in Chicago became wholly inadequate for its needs, and petitioner's offices and plant were moved to Cleveland, Ohio, in 1934. The space occupied in Cleveland consisted of two floors with approximately 11,000 square feet of floor area; general offices, warehouse and shipping room were located on the first floor, and the processing machinery in the basement. Petitioner's business increased gradually after its removal to Cleveland and by the year 1940, its annual gross sales were $1,500,000. In 1941, its sales were approximately $2,500,000. Additional winding and conditioning machinery was added from time to time as petitioner's business expanded and by 1941, all of the space in the processing room was completely occupied by winding and conditioning *148 machinery and there was no room for the installation of any additional machinery. At this time petitioner had outgrown the Cleveland offices, warehouse, shipping room and plant. Most of the employees in the processing plant are women, and the unsanitary and crowded conditions there caused labor difficulties such as walkouts. New and larger office and plant facilities were needed by petitioner, but due to war conditions no satisfactory building could be found, and the officers of petitioner contemplated the erection of its own building when sufficient corporate funds were available. No corporate funds were available for building purposes at the end of the year 1941. The balance sheet for December 31, 1941, indicates a short-term liability of $200,000 and accrued taxes of approximately $74,000, while cash on hand amounted to only $113,467.94. During the war years building restrictions precluded the possibility of petitioner's going forward with its building program. Philip Leff has been president and Carl Leff, secretary, since petitioner's organization. Boris Mishell was treasurer and general manager until his death in 1943, at which time he was succeeded by his son, Joseph Mishell. *149 In the operation of the business Boris Mishell, during his lifetime, formulated the policies but consulted with the Leff brothers. Since Boris' death Joseph Mishell has similarly guided its affairs. For his services Joseph Mishell received a salary of $36,000 in the taxable year 1944. On September 25, 1944, petitioner's directors declared a stock dividend of $150,000 because it was felt that the surplus and undivided profits were necessary for the appropriate management of the business. During all the years of petitioner's existence through 1941, it never had sufficient working capital to meet its normal requirements, which included general operations, the carrying of sufficient inventory, and carrying its customers' accounts receivable. During each of the years from 1934 through 1941, petitioner was required to borrow to the maximum or near maximum of its bank credit for these purposes. These borrowings were made each year to the near limit of the credit extended by its bank on both direct loans (unsecured) and indirect loans (secured by customers' paper). During the war years, due to the abnormal cash position of petitioner's customers no bank borrowings were made, but in 1948, *150 petitioner was again compelled to borrow funds for working capital. The following tables show the maximum borrowings of petitioner from 1934 through 1941 (this compilation is from the records of petitioner's bank, The National City Bank of Cleveland): Largest
Largest
Greatest
Amount
Amount
Total Bor-
Owed on
Owed on
Total Direct
rowed at
Maximum
Direct
Maximum
Indirect
and Indirect
Any One
Direct Line
Account
Indirect Line
Account
Lines of
Time During
Year
of Credit
Duing Year
of Credit
During Year
Credit
the Year
1934
$ 75,000
$ 75,000
$50,000.00
$13,812.65
$125,000.00
$ 85,948.08
1935
100,000
100,000
50,000.00
17,178.21
150,000.00
108,135.66
1936
100,000
100,000
50,000.00
10,647.99
150,000.00
100,835.80
1937
100,000
150,000
83,209.58
83,209.58
183,209.58
172,614.46
1938
100,000
100,000
83,209.58
56,575.39
183,209.58
156,575.39
1939
150,000
100,000
91,620.78
91,620.78
241,620.78
166,620.78
1940
200,000
50,000
91,620.78
25,712.76
291,620.78
50,000.00
1941
200,000
125,000
91,620.78
291,620.78
125,000.00
Up to and including the year 1941, petitioner *151 was unable to carry its customers' accounts and was forced into the position of asking and securing from its customers negotiable promissory notes for discount purposes. Petitioner was forced to discount its customers' notes and borrow on its own credit in order to obtain sufficient working capital. The conservative financial policy of Boris Mishell, carried on by Joseph Mishell, was the factor which induced petitioner's bank to extend a more liberal line of credit on both direct and indirect loans than it could have otherwise obtained. The factors constituting this conservative financial policy were: (a) a steady growth and expansion of the business, (b) reasonable salaries and (c) retention of earnings to meet the steadily increasing demands of petitioner for working capital; but even so, petitioner was never able to accumulate sufficient funds for working capital purposes, except during the war years. The terms of trade discounts in the yearn business have been for many years: three per cent, 10 days; two per cent, 70 days; net, 90 days. For the three years, 1939 through 1941, the monthly average of accounts receivable on its books was slightly less than three times its average *152 sales per month. During the war years, however, commencing with 1942 and extending through 1945, petitioner's customers were in a position to and did take advantage of the trade discounts, with the result that the average accounts receivable were on the books for approximately 10 days, the length of time which would permit its customers to take advantage of the maximum trade discount of three per cent. For the year 1944, the average monthly sales were approximately one and one-half times the amount of the average monthly accounts receivable, and during the year 1945, the average monthly sales were more than twice the average of the monthly accounts receivable. The following schedule shows the actual relationship of petitioner's sales to its accounts receivable during the three years prior to 1942, for the taxable year in question, 1944, and for the years 1945 and 1948. Using the three years, 1939 through 1941, as a starting point, the average ratio of sales to receivables for those years is 35 per cent and projecting that ratio to the taxable year, and the years 1945 and 1948, the following schedule indicates what the accounts receivable for those years would have been under circumstances *153 found true in 1939 through 1941: Bal. at end
of month
1939
1940
1941
1944
Jan.
$ 216,128.92
$ 303,220.37
$ 398,696.23
$ 99,443.29
Feb.
236,890.45
274,807.21
512,643.46
166,442.72
Mar.
255,765.62
285,864.31
562,585.69
180,354.34
Apr.
290,286.23
396,767.26
542,997.16
230,072.53
May
319,387.87
396,439.00
611,995.00
149,309.34
June
389,969.56
488,114.39
634,082.72
171,217.36
July
384,805.65
500,561.66
664,510.02
154,883.03
Aug.
400,567.01
474,890.87
653,936.18
153,097.62
Sept.
513,050.48
399,081.72
542,604.06
93,554.16
Oct.
421,427.55
404,292.66
582,338.08
89,090.80
Nov.
374,875.88
392,556.21
514,342.03
87,829.58
Dec.
218,916.37
303,817.09
376,895.94
87,986.85
Total Acct. Rec.
$4,022,071.59
$4,620,412.75
$6,606,626.57
$1,663,281.62
Av. per Mo.
335,173.00
385,034.00
549,802.00
138,606.80
Sales per Year
1,538,566.80
1,434,262.40
2,458,319.88
2,449,929.01
Av. Sales Per Mo.
128,214.00
119,521.00
204,859.00
204,161.00
Ratio of Sales to
Accts. Rec.
38%
31%
37%
148%
Average Accts.
Rec. on 35%
Basis
583,843.00
Bal. at end
of month
1945
1948
Jan.
$ 123,211.74
$ 338,937.78
Feb.
99,495.24
405,421.82
Mar.
78,122.11
508,707.55
Apr.
61,669.42
543,324.78
May
25,556.76
594,240.28
June
67,696.96
564,877.23
July
55,262.98
528,144.11
Aug.
115,505.27
578,754.15
Sept.
119,718.59
582,433.89
Oct.
88,982.60
492,694.84
Nov.
102,784.84
481,860.18
Dec.
54,876.87
469,289.31
Total Acct. Rec.
$ 992,883.38
$6,088.685.92
Av. per Mo.
82,740.00
507,390.00
Sales per Year
2,257,549.41
3,383,148.16
Av. Sales Per Mo.
188,129.00
281,929.00
Ratio of Sales to
Accts. Rec.
227%
56%
Average Accts.
Rec. on 35%
Basis
537,512.00
705,511.00
*154 The abnormal cash position of petitioner's customers during the war years produced an abnormal amount of cash in petitioner's account, which would not have normally been there and which would be and was expended once business returned to normal after the war's end. It was the judgment of Mishell in the fall of 1944 that the war would soon be over, and that with the war's end petitioner would again be required to extend credit to its accounts on a 90-day basis. The following table shows the length of time petitioner's accounts receivable were on its books for any given year. This table was prepared by dividing the average monthly balance of petitioner's accounts receivable by its average monthly sales. The quotient of this fraction when multiplied by 30 gives the average number of days petitioner carried its accounts receivable. Average Days
Accounts Re-
ceivable on
Year
Books
1939
78
1940
96
1941
81
1942
45
1943
23
1944
20
1945
13
1946
16
1947
52
1948
54
1949 (Jan.-March)
56
During the war years, including 1944, petitioner's inventory was below normal levels and Mishell believed in 1944 that, following the war, petitioner would again *155 be required to carry adequate inventories and petitioner has always tried to take advantage of the discounts available to it by paying for merchandise within the discount period. Petitioner's balance sheets as of December 31, for the years 1939 to 1948 and as of March 31, 1949, are as follows: 12/31/39
12/31/40
12/31/41
12/31/42
ASSETS: Cash on hand and banks
$ 32,453.23
$ 32,070.70
$113,467.94
$143,298.35
Accounts and notes rec
218,916.37
303,817.07
376,895.94
155,704.33
Inventory
74,644.05
50,035.21
149,672.63
97,046.01
Cash surrender life ins.
8,181.75
8,757.50
9,331.50
9,903.00
Prepaid items
1,716.89
2,536.73
946.01
963.82
Equip. and autos (deprec.)
6,677.13
6,087.04
1.00
1.00
Post-war excess prof. ref
8,480.00
U.S. govt. securities
110,000.00
Other securities Land
TOTAL ASSETS
$342,589.42
$403,304.25
$650,315.02
$525,396.5
LIABILITIES: Accounts payable
$ 55,471.54
$ 89,482.91
Notes payable
$200,000.00
Accrued commissions
Accrued taxes
2,049.80
1,075.60
1,900.43
$ 2,263.30
Accrued income taxes
9,610.00
6,469.55
72,000.00
108,047.32
Reserve for bad debts
15,584.24
22,555.84
25,042.78
19,181.05
Reserve for sales disc
TOTAL LIABILITIES
$ 82,715.58
$119,583.90
$298,943.21
$129,491.67
CAPITAL: Capital stock
$100,000.00
$100,000.00
$100,000.00
$300,000.00
Surplus
159,873.84
183,720.35
251,371.81
95,904.84
TOTAL CAPITAL
$259,873.84
$283,720.35
$351,371.81
$393,904.84
*156 12/31/43
12/31/44
12/31/45
12/31/46
ASSETS: Cash on hand and banks
$239,391.78
$390,725.55
$440,508.24
$106,212.33
Accounts and notes rec.
86,989.41
87,986.85
54,876.81
212,085.40
Inventory
131,199.52
60,326.65
84,800.71
529,084.69
Cash surrender life ins.
Prepaid items
1,068.71
919.34
1,467.57
2,272.10
Equip. and autos (deprec.)
1.00
1.00
1.00
1.00
Post-war excess prof. ref.
16,480.00
28,500.00
16,392.71
U.S. govt. securities
109,000.00
109,000.00
109,000.00
110,000.00
Other securities
Land
TOTAL ASSETS
$584,130.42
$677,459.39
$707,047.10
$959,655.52
LIABILITIES: Accounts payable
$ 91,142.84
Notes payable
Accrued commissions
$ 4,383.86
7,500.00
Accrued taxes
$ 6,489.85
$ 6,473.24
5,588.59
7,163.75
Accrued income taxes
99,000.00
142,000.00
120,000.00
107,289.77
Reserve for bad debts
19,001.52
18,990.17
15,385.46
32,833.60
Reserve for sales disc.
6,362.56
TOTAL LIABILITIES
$124,491.37
$167,463.41
$145,357.91
$252,292.52
CAPITAL: Capital stock
$300,000.00
$450,000.00
$450,000.00
$500,000.00
Surplus
159,639.05
59,995.98
111,689.19
207,363.00
TOTAL CAPITAL
$459,639.05
$509,995.98
$561,689.19
$707,363.00
*157 12/31/47
12/31/48
3/31/49
ASSETS: Cash on hand and banks
$ 203,588.64
$218,290.02
$ 226,757.28
Accounts and notes rec.
386.077.36
469,289.31
490,081.73
Inventory
252,827.95
198,542.16
206,898.38
Cash surrender life ins.
1,252.00
1,650.00
1,650.00
Prepaid items
2,265.70
2,119.95
1,786.25
Equip. and autos (deprec.)
19,720.89
24,407.88
24,620.58
Post-war excess prof. ref.
U.S. govt. securities
82,000.00
21,000.00
Other securities
104,258.10
Land
62,500.00
75,026.40
TOTAL ASSETS
$1,051,990.64
$997,799.32
$1,026,820.62
LIABILITIES: Accounts payable
$ 130,856.36
$ 4,980.77
Notes payable
Accrued commissions
10,000.00
$ 10,500.00
4,500.00
Accrued taxes
460.67
517.71
2,774.39
Accrued income taxes
69,998.87
76,090.20
72,109.80
Reserve for bad debts
32,833.60
32,833.60
34,762.91
Reserve for sales disc
7,442.87
8,121.37
14,700.00
TOTAL LIABILITIES
$ 251,592.37
$128,162.88
$ 133,827.87
CAPITAL: Capital stock
$ 500,000.00
$500,000.00
$ 500,000.00
Surplus
300,398.27
369,636.44
392,992.75
TOTAL CAPITAL
$ 800,398.27
$869,636.44
$ 892,992.75
In 1946, governmental wartime building restrictions *158 were lifted, and Joseph Mishell (hereinafter called Mishell) immediately conferred with N. E. Gallin, president of the Norge Construction Company of Cleveland, Ohio, concerning the erection of a building suitable to provide for petitioner's needs. Mishell informed Gallin that petitioner required a building with 30,000 square feet on one floor; that this building was to house general and private offices, display rooms, stock rooms, winding and processing rooms, receiving and shipping facilities, and that a parking area outside the building was desired. The construction company offered to erect the proposed building on a basis of cost plus 10 per cent for overhead and 10 per cent for profit. It could not, however, guarantee any maximum cost of construction nor could it guarantee any definite time for completion. Under these circumstances Gallin advised Mishell to defer construction until costs had settled, materials could be more readily obtained, and the time for completion of the proposed building could be fixed. Mishell then considered the advisability of purchasing the building in which petitioner was one of the tenants and remodeling to meet petitioner's needs, but was alvised *159 not to consider such a course because the same difficulties would be encountered in a remodeling program as would be encountered in the construction of a new building. From time to time thereafter Mishell conferred with Gallin concerning plans for the building, and in November 1948 Gallin stated for the first time that conditions in the building industry had changed and that his company was prepared to erect the building for a definite price within specified time limitations. Mishell thereupon settled upon a location and petitioner purchased a parcel of land containing 50,000 square feet, located on the southwest corner of Chester Avenue and East 40th Street, in Cleveland, Ohio, for the sum of $62,500. Petitioner then authorized Leonard L. Broida, a registered architect associated with the Norge Construction Company, to prepare plans and specifications for the building. The preliminary plans and specifications were completed and approved and the final plans and specifications were about half finished shortly after January 1, 1949. At that time, however, the balance sheet of petitioner as of December 31, 1948, was completed and Mishell learned that the accounts receivable of petitioner *160 were approximately $500,000; that petitioners' inventory was high in comparison to its inventories during the war years; and that the cash of petitioner was dwindling. Mishell learned that in order to go forward with the building program petitioner would have to borrow the sum of $300,000 and, therefore, the building program was reconsidered. At that time a building occupied by the Jamestown Worsted Mills, Jamestown, New York, was put on the market for sale and petitioner, rather than becoming indebted in the sum of $300,000 for the erection of a new building purchased this building for $70,000. After expenditures of from $40,000 to $50,000 for the installation of a humidification system, heating system, lighting equipment, and loading docks, the Jamestown building will be occupied by petitioner until it is financially able to erect a building on its Cleveland site without extensive borrowing. Petitioner paid $4,500 for architectural services in connection with the preparation of the plans for its Cleveland building. These plans have been retained and will be used by petitioner when it is able to complete its building program. Petitioner requires $250,000 for the operation of its *161 business exclusive of the purchase of yarns. By April 30, 1949, petitioner's cash on hand was $140,000, its inventory was approximately $200,000, and current accounts receivable had risen to $575,000. As of that date petitioner's current liabilities and commitments were in excess of $280,000. No cash dividend was declared by petitioner during 1944, and although petitioner had earnings after taxes and added to surplus in each of the years during the period 1928 to 1943, inclusive, no cash dividend was declared in any of those years. The original capital stock issued totalled $50,000 and as of December 31, 1944, the outstanding capital stock totalled $450,000, of which $400,000 represented nontaxable stock dividends. These stock dividends were declared by petitioner in 1932, 1942 and 1944 in the respective amounts of $50,000, $200,000 and $150,000. A short time prior to the year 1943, some of petitioner's stock held by Boris Mishell was distributed to his sons, and the ownership thereof was held by Boris Mishell and his two sons, Joseph and Robert. Subsequent to the death of Boris Mishell and by the year 1944, Joseph Mishell acquired all of the shares previously held by himself, *162 his brother and his father, with the result that at all times during the year 1944, the shares of petitioner were held as follows: Joseph Mishell
1,500 shares
Philip Leff (or family)
1,500 shares
Carl Leff (or family)
1,500 shares
Neither Philip Leff nor Carl Leff drew any salaries from the corporation during the year 1944, or during any prior years. Petitioner has never made any advances or loans, directly or indirectly, to any of its officers or shareholders. None of petitioner's funds have ever been invested in stocks or bonds of other corporations unrelated to petitioner's business. During the taxable year here involved petitioner was not a mere holding or investment company. Petitioner did not during the taxable year 1944, permit its earnings to accumulate beyond the reasonable needs of its business, nor was it availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. Opinion BLACK, Judge: The only question in this proceeding is whether petitioner for the year 1944 *163 is subject to the surtax under section 102 of the Internal Revenue Code, the pertinent provisions of which are printed in the margin. [1]
*164 It is conceded that petitioner was not "formed" for the prohibited purpose, but respondent contends that petitioner was "availed of" in 1944 for that purpose. Petitioner is not "a mere holding or investment company" as that term is used in section 102(b) but rather petitioner is an operating company engaged in the business of processing and selling wool yarn. Section 102(c) provides that an accumulation of earnings or profits beyond the reasonable needs of the business is determinative of the purpose to avoid surtax upon shareholders unless petitioner, by the clear preponderance of the evidence, proves to the contrary. Petitioner contends that its accumulated earnings were reasonably, properly and prudently retained and the retention of its earnings was not for the prohibited purpose. What the reasonable needs of petitioner's business were in 1944, and whether petitioner was "availed of" for the prohibited purpose are questions of fact to be determined from all the evidence. Helvering v. National Grocery Co., 304 U.S. 282; Helvering v. Chicago Stockyards Company, 318 U.S. 693; Cecil B. deMille Productions, Inc., 31 B.T.A. 1161, affirmed *165 90 Fed. (2d) 12, certiorari denied 302 U.S. 713. Petitioner contends that its earnings for the year 1944 were retained: (a) To provide funds for the acquisition of land and building and machinery necessary for use in petitioner's business. (b) To provide the petitioner with adequate working capital for the operation of its business exclusive of the purchase of raw materials. (c) To provide petitioner with the means of extending credit to its customers in the usual and normal operation of its business, and with funds necessary for the carrying out of a reasonable inventory to meet the requirements of its business. (d) To provide petitioner with funds for a reasonably anticipated expansiion of its business. We think petitioner has met its burden of proof. Petitioner has been, from its incorporation in 1923 to the taxable year 1944 and to the date of the hearing of this proceeding in 1949, a business which has continually expanded and a business which, in normal times, has been without adequate working capital in the sense that large sums of money had to be seasonably borrowed to carry on the business. Because of its conservative financial policy petitioner *166 was able to borrow, on a liberal line of credit, large sums on its own credit and by discounting its customers' negotiable notes. Petitioner considered that its customer relations were placed in jeopardy by asking for negotiable notes when petitioner's competitors were able to carry their accounts receivable on an open account basis. Considering that petitioner has always attempted to pay its own bills within the maximum discount period it is apparent that petitioner required more working capital to carry its customers' accounts receivable. Petitioner's excellent cash position in 1944 must be examined in the light of the evidence which shows that its high cash balance was almost entirely a result of low accounts receivable in that year brought about by the good cash position of its customers. From our findings of fact it can be seen that petitioner's accounts receivable during the year 1944 were unusually low. It was the opinion of petitioner that upon a return to normal conditions it would again be required to finance its customers' accounts receivable, which would require considerable amounts of cash in view of the fact that petitioner, itself, has always attempted to take full *167 advantage of the discounts allowed by its sellers. Respondent seems to suggest that because petitioner's credit position with its bank was exceedingly good, it might continue to borrow in order to finance its future needs for working capital. However, we would be unwilling to say that a business should borrow rather than operate on its own cash resources. Cf. General Smelting Co., 4 T.C. 313. Petitioner's inventory in 1944 was $60,326.65, which was approximately $140,000 short of what petitioner considered to be a minimum inventory requirement for annual gross sales of $2,000,000. Petitioner's annual gross sales since 1944 have actually been in excess of $2,000,000, and its annual closing inventory for the years after 1945 has averaged over $200,000. By 1941, petitioner was in need of larger quarters but no suitable building could be found and petitioner decided to build its own building when corporate funds were available. During the war years building restrictions precluded the possibility of erecting its own building but positive action was taken as soon as conditions permitted. Petitioner obtained a building site for $62,500 and paid architectural fees of $4,500 for its proposed building. At this time, however, petitioner's balance sheet for December 1948 showed that its cash was dwindling and accounts receivable were approximately $500,000. Petitioner would have to borrow $300,000 to go forward with its building program and, therefore, petitioner reconsidered its plans. Petitioner, rather than borrow $300,000, purchased a building in Jamestown, New York, for $70,000 and an additional $40,000 or $50,000 will be required to prepare this building for needs of petitioner. The building site purchased for $62,500 is still owned by petitioner and there was testimony to the effect that it will be used when sufficient cash is available for construction. Petitioner determined that after the war it would need additional capital for which its earnings in 1944 were accumulated, along with those of prior years. As we said in J. L. Goodman Furniture Co., 11 T.C. 530: * * * He estimated in 1942 and 1943 that the petitioner would need funds for larger inventories and for the extension of credit in connection with this anticipated post-war business, as well as additional operating cash, in an amount about equal to the total capital and surplus *168 in 1942 and 1943. It is not necessary to decide whether or not his estimates for this purpose were fully justified, since his estimates were honest, and substantial amounts of capital would be necessary and were necessary when the boom developed. Lion Clothing Co., 8 T.C. 1181. We have found that, exclusive of yarn purchases, approximately $250,000 was required to operate petitioner's business for one year. The cash petitioner required in order to bring its inventory to a normal level, plus the amount required for annual operating expenses, totals approximately $390,000, which would leave the petitioner with approximately $109,000 excess cash at the close of 1944. However, petitioner's liability in 1944 for accrued state taxes and accrued Federal income and excess profits taxes totals approximately $148,000 and thus it appears that petitioner's net income, after deduction of taxes, was approximately $43,000. We do not think petitioner's action in adding this latter amount to earned surplus instead of distributing it as dividends to stockholders was unreasonable under the circumstances. Petitioner has never loaned money to any of its stockholders nor has it invested *169 money in unrelated businesses. Although petitioner's managing officer testified that he knew the stock dividends were nontaxable, he also stated that petitioner has no purpose of preventing the imposition of surtax upon its shareholders by permitting a part of its earnings and profits for 1944 to accumulate instead of being divided or distributed and his testimony is supported by the evidence, although petitioner never paid dividends through 1944. [2]
Petitioner, we think, has sustained its burden of showing that the accumulation of its earnings and profits in the taxable year was not beyond the reasonable needs of its business, and it was not availed of for the prohibited purpose under section 102. We, therefore, hold that respondent erred in determining that petitioner was subject to surtax under section 102 for the year 1944. Decision will be entered for the petitioner. Footnotes
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: * * *
(b) Prima Facie Evidence. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of a purpose to avoid surtax upon shareholders. (c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.↩
2. In 1946, 1947 and 1948, petitioner has paid dividends.↩